AO 91 (Rev. 11/11) Criminal Complaint　　　　　　　　　　　　　　　　　AUSA G. David Rojas (312) 886-5966

FILED
11/25/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| UNITED STATES OF AMERICA | CASE NUMBER: 24 CR 545 |
|---|---|
| v. | **UNDER SEAL** |
| NICHOLAS SAYEGH | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about March 29, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 846 | Attempt to knowingly and intentionally possess with intent to distribute a controlled substance, namely, five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

MICHAEL O'CONNOR (Affiliate)
Digitally signed by MICHAEL O'CONNOR (Affiliate)
Date: 2024.11.25 09:11:14 -06'00'

MICHAEL O'CONNOR
Task Force Officer
Drug Enforcement Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: November 25, 2024

*Judge's signature*

City and state: Chicago, Illinois　　　　　KERI L. HOLLEB HOTALING, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, MICHAEL O'CONNOR, being duly sworn, state as follows:

1. I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and have been so employed since approximately April 2018. My current responsibilities include the investigation of narcotics trafficking offenses.

2. As part of my duties as a DEA Task Force Officer, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the federal controlled substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

3. This affidavit is submitted in support of a criminal complaint alleging that on or about March 29, 2023, NICHOLAS SAYEGH attempted to knowingly and intentionally possess with intent to distribute a controlled substance, namely, five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846.

4. This affidavit is based on, among other things: (a) my personal knowledge of the facts and circumstances of this investigation described below; (b) information provided by other law enforcement officers; (c) information obtained from witnesses, including confidential sources working for the DEA or other law enforcement agencies; (d) consensually-recorded communications and meetings; (e) the results of physical surveillance conducted by law enforcement; (f) the results of laboratory analysis; and (g) my training and experience and the training and experience of other law enforcement officers involved in this investigation.

5. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging SAYEGH with attempted possession with intent to distribute and distribute five kilograms or more of cocaine, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that SAYEGH committed the offense alleged in the complaint.

## FACTS ESTABLISHING PROBABLE CAUSE

6. Since in or around September 2019, DEA has been investigating a drug trafficking organization ("DTO") that is led by NICHOLAS SAYEGH (the "SAYEGH DTO"). The SAYEGH DTO is believed to be involved in the illegal purchase, sale, and distribution of marijuana and products containing tetrahydrocannabinol ("THC") from California to several states in the Midwest, including Illinois, and the illegal distribution of large kilogram quantities of cocaine in and around the area of Chicago.

7. As explained in more detail below, on or about March 29, 2023, SAYEGH met with an individual who, unbeknownst to SAYEGH, was an undercover law enforcement officer ("UC-2"), in order to make a partial payment of more than approximately $54,000 in exchange for approximately 15 kilograms of (sham) cocaine.

### A. March 27, 2023, "Chalan" Delivers Approximately 15 Kilograms of Cocaine to UC-1.

8. On or about March 26, 2023, at approximately 7:15 p.m. and 7:30 p.m., an undercover law enforcement officer posing as a narcotics trafficker ("UC-1") had two consensually recorded WhatsApp calls with a narcotics trafficker known as "Chalan," who was using phone number 979-607-0105 (the "Chalan Phone").[1] During these calls, UC-1 and Chalan arranged to meet on or about March 27, 2023, at approximately 2:30 p.m. in Pasadena, Texas, for Chalan to distribute approximately 25 kilograms of cocaine to UC-1.

9. On or about March 27, 2023, between approximately 1:02 p.m. and 2:11 p.m., Chalan, using the Chalan Phone, exchanged a series of consensually captured

---

[1] Some of the consensually recorded conversations and text messages ("recorded conversations") have been summarized in this affidavit. The language that is quoted from the recorded conversations throughout this affidavit is based upon a preliminary review of the recorded conversations, and not final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate and, unless otherwise indicated, in Central Time. The summaries do not include all statements or topics covered during the recorded conversations. At various points in the affidavit, I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from confidential sources, the contents and context of the recorded conversations, events that took place before and after the conversations, my knowledge of the investigation, my experience and training, and the experience and training of other law enforcement agents in this investigation. Some of the recorded conversations contained herein are in the Spanish language. or these conversations, I have relied on draft summaries of the conversations done by law enforcement personnel or interpreters contracted by law enforcement.

WhatsApp messages with UC-1. During this conversation, Chalan asked to meet around 2:40 or 2:50 p.m. UC-1 asked for an address and suggested meeting at 3:00 p.m. Chalan sent an address for an apartment complex on the 1700 block of Jenkins Rd. in Pasadena, Texas ("Apartment Complex A").

10. At approximately 3:00 p.m., Chalan, using the Chalan Phone, had a consensually recorded WhatsApp call with UC-1. During the call, Chalan said he was close and was driving a small blue sedan.

11. Prior to UC-1's meeting with Chalan, agents outfitted UC-1 with concealed audio recording equipment.

12. Surveillance observed the following at the parking lot for Apartment Complex A:

    a. At approximately 3:07 p.m., UC-1's vehicle and a blue Toyota Scion sedan arrived at the parking lot.

    b. At approximately 3:10 p.m., the two vehicles parked along the west side of the apartment parking lot near soccer fields. A man (believed to be Chalan) exited the Toyota Scion. UC-1's vehicle then repositioned to the other side of the Toyota Scion.

    c. At approximately 3:11 p.m., Chalan had a conversation with UC-1. Chalan then opened the right door to the Toyota Scion.

13. According to UC-1, Chalan leaned the backrest forward and grabbed a red and black gym bag.

4

14. Surveillance observed Chalan hand the red and black gym bag to UC-1, who placed it in the rear driver's side door of UC-1's vehicle.

15. According to UC-1, Chalan stated that all 15 kilograms were in there. UC-1 responded that there were supposed to be 25 kilograms, not 15. Chalan replied that he was told to give UC-1 15 kilograms. UC-1 told Chalan to make a call and verify that because UC-1 was told something different.

16. At approximately 3:12 p.m., surveillance observed Chalan enter the driver's seat of the Toyota Scion, and Chalan and UC-1 continued to speak through the passenger-side window of the Toyota Scion.

17. According to UC-1, UC-1 told Chalan that they should leave but to call UC-1 back once Chalan confirmed.

18. At approximately 3:14 p.m., surveillance observed UC-1 enter UC-1's vehicle and both vehicles left the parking lot.

19. According to UC-1, several minutes later, Chalan called UC-1 and confirmed the amount was 15 kilograms.

20. Following this meeting, UC-1 met with agents and provided the red and black bag. Agents submitted the substance inside the bag to the DEA laboratory for testing, which determined that the substance was approximately 15.03 kilograms of cocaine.

**B. March 29, 2023, SAYEGH Pays UC-2 Approximately $54,695 in Cash in Exchange for Approximately 15 Kilograms of Sham Cocaine.**

21. On or about March 29, 2023, at approximately 10:38 a.m., an undercover law enforcement officer posing as a narcotics trafficker ("UC-2") had a consensually recorded call with an unknown narcotics trafficker ("UM-1"), who was using phone number 984-238-4047 the ("UM-1 Phone"). During the call, UC-2 said he could meet with UM 1 at approximately 3:00 p.m. at the location he sent the boss.[2] UM-1 said he needed to check if his workers could meet at 3:00, and would call back.

22. Between approximately 10:46 a.m. and 1:48 p.m., UC-2 engaged in a series of unrecorded WhatsApp calls with an unknown narcotics trafficker ("UM-2"), using phone number 52-753-140-7596 (the "UM-2 Phone"). According to UC-2, during these calls, UM-2 wanted to meet at an address on the 400 block of N. Michigan Ave. in Chicago. Later, UM-2 provided the address for Hotel A on the 400 block of N. Park Dr. in Chicago.

23. Prior to UC-2's meeting, agents outfitted UC-2 with concealed audio recording equipment and a bag containing approximately 15 kilograms of sham cocaine.

24. At approximately 3:05 p.m., surveillance observed UC-2 arrive and park at the meet location, get out of UC-2's vehicle, and walk to the end of a cul-de-sac.

25. According to UC-2:

---

[2] According to UC-2, the prior communication was unrecorded because it was over WhatsApp.

a. At approximately 3:10 p.m., UC-2 called UM-2 to let him know that UC-2 had arrived. Over the next few minutes, UC-2 and UM-2 had additional calls to coordinate the meeting.

b. At approximately 3:21 p.m., UM-2 called UC-2. During the call, UM-2 said his people were in front of the address for Hotel A and asked if UC-2 saw a black Range Rover or a Mercedes-Benz. UC-2 said he did not see either one.

26. At approximately the same time, surveillance observed a black Range Rover Sport, bearing dealer license plate number DL1924EC, park behind a surveillance vehicle in front of Hotel A.

27. According to UC-2, at approximately 3:25 p.m., UM-2 called UC-2 again. During the call, UM-2 asked if UC-2 saw a Range Rover. UC-2 said he did not. UC-2 said he would walk around to see if he spotted the Range Rover. UC-2 also said he was by Restaurant A, which is located on the 200 block of E. Illinois St. in Chicago, close to Hotel A.

28. At approximately the same time, surveillance observed the black Range Rover travel westbound on Water St., as well as a two-tone white-and-black Mercedes, bearing Illinois license plate number DB70759, following the Range Rover in tandem. The vehicles continued eastbound on Columbus Dr. and traveled northbound on Cityfront Plaza Dr.

29. According to UC-2, at approximately 3:26 p.m., UM-2 called UC-2. During the call, UM-2 told UC-2 to stay near Restaurant A and that UM-2 was sending his people to Restaurant A.

30. At approximately 3:28 p.m., surveillance observed the Range Rover and Mercedes park in the roundabout at Cityfront Plaza Dr. and Illinois St. The driver of the Mercedes, NICHOLAS SAYEGH,[3] exited the Mercedes. A surveillance photograph of SAYEGH appears below.



31. According to UC-2, UC-2 approached SAYEGH and handed to SAYEGH the bag that contained approximately 15 kilograms of sham cocaine. SAYEGH placed the bag in the trunk of the Mercedes.

---

[3] Law enforcement identified the driver of the Mercedes as SAYEGH as follows: UC-2 subsequently identified the driver of the Mercedes as SAYEGH based on a review of a booking photograph of SAYEGH maintained by the Chicago Police Department. I also identified the person in the surveillance photograph below as SAYEGH based on a review of the booking photograph of SAYEGH. In addition, as described below, Individual A, the passenger in the Mercedes, identified the driver as SAYEGH.

8

32. According to UC-2's recording, UC-2 asked, "Where's the dollar?" According to UC-2, he was asking SAYEGH for a partial payment for the delivery of the cocaine.

33. According to UC-2, SAYEGH told UC-2 to grab the shoebox in the trunk of the Mercedes. UC-2 then retrieved from the trunk of the Mercedes a tan shoebox that contained cash.

34. Surveillance then observed SAYEGH take the bag that contained the sham cocaine from the Mercedes and place it into the trunk of the Range Rover. SAYEGH then got back into the driver's seat of the Mercedes.

35. Following this meeting, UC-2 met with agents and provided the shoebox from the Mercedes. The shoebox contained approximately $54,695 in cash. A photograph of the shoebox of cash is below.



36. Agents attempted to contain the Range Rover and Mercedes to conduct arrests, but both vehicles broke containment and traveled quickly southbound.

### C. Interview of Individual A

37. At approximately 3:35 p.m., surveillance observed the Mercedes behind a vehicle at a red light at Michigan and Wacker.

38. Agents attempted to approach the vehicle with police lights and while wearing police markings. Individual A exited the passenger side of the Mercedes and ran westbound on Wacker, while the Mercedes traveled quickly southbound on Michigan. Agents pursued Individual A on foot and placed him under arrest.

39. After being informed of his *Miranda* rights, Individual A provided the following information to law enforcement:

    a. The driver of the Mercedes was an acquaintance known to him as "Nick Sayegh."

    b. That day, Individual A met with SAYEGH to go the gym, was unaware they were going to make any stops prior to the gym and did not know with whom SAYEGH was meeting.

    c. Individual A did not know why SAYEGH was fleeing from the police and pleaded with SAYEGH to stop the vehicle because he was driving dangerously. When they got stuck in traffic, SAYEGH told Individual A to get out of the car. Individual A ran away from the car because he was scared.

40. Agents released Individual A in furtherance of the investigation.

### D. Interview of CS-4

41. On or about April 3, 2023, a confidential source ("CS-4")[4] told law enforcement that, during a Snapchat call, SAYEGH told CS-4 that SAYEGH drove the wrong way down Wacker to get away from the police.

42. On or about April 4, 2023, CS-4 provided the following information to law enforcement:

    a. During a phone call, SAYEGH said he and his driver met with the driver of a "good client," which CS-4 understood to mean a trusted narcotics associate. SAYEGH and his driver were meeting to look at and purchase "bricks" of "blow" from the client, meaning multiple kilograms of cocaine. When they approached the client's driver, the police approached them, and SAYEGH fled the area.

    b. SAYEGH said the client's driver had been arrested prior to the meeting, but SAYEGH did not know that at the time.

    c. When CS-4 asked SAYEGH why he went to the meeting himself instead of using a courier, SAYEGH said he wanted to check out the product he was purchasing.

---

[4] CS-4 started cooperating with law enforcement in or around December 2021. CS-4 learned of information regarding the SAYEGH DTO while s/he was formerly in a romantic relationship with a member of the SAYEGH DTO. CS-4 does not have any pending charges and has not requested any monetary compensation. According to a criminal history inquiry, CS-4 does not have any criminal convictions. I believe that the information provided by CS-4 set forth in this affidavit is reliable because it has been corroborated in significant respects by text messages, surveillance, and other information described in this affidavit.

## CONCLUSION

43. Based on the foregoing, I respectfully submit that there is probable cause to believe that, on or about March 29, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, NICHOLAS SAYEGH did attempt to knowingly and intentionally possess with intent to distribute a controlled substance, namely, five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

MICHAEL O'CONNOR (Affiliate)
Digitally signed by MICHAEL O'CONNOR (Affiliate)
Date: 2024.11.25 09:12:26 -06'00'

MICHAEL O'CONNOR
Task Force Officer
Drug Enforcement Administration

SWORN TO AND AFFIRMED by telephone November 25, 2024.

_____
Honorable KERI L. HOLLEB HOTALING
United States Magistrate Judge